## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CHRISTOPHER KEITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CIV-05-72-M** |
| | ) | |
| **REGINALD HINES, Warden, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, Christopher Keith, a state prisoner appearing pro se, has brought this action pursuant to 42 U.S.C. § 1983, alleging that Defendants[1] violated his Eighth Amendment rights through their deliberate indifference to his serious medical needs.[2] Negligence under the state law of Oklahoma is also claimed. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B).

In accordance with the undersigned's order and with *Martinez v. Aaron*, 570 F. 2d 317 (10th Cir. 1978), a special report was filed by Defendants [Doc. No. 24]. Following review of the report, the undersigned ordered that such report be supplemented with a complete set of Plaintiff's medical records [Doc. No. 28]. The supplementary documents were subsequently filed under seal [Doc. No. 34]. Defendants have also filed a motion

---

[1]Plaintiff alleges the named Defendants are employed by the Oklahoma Department of Corrections ("DOC") and describes them as follows: "Reginald Hines and Dennis Cotner are high ranking officials of DOC, working in DOC headquarters in Oklahoma City, OK. Dr. Stites and Dr. Hiti are medical doctors employed by or contracted by DOC at the Lexington Correctional Center in Lexington, OK (LCC). Jean Bond is the Health Services Administrator at LCC. Sgt. Reed is a DOC Transport Officer." [Doc. No. 1, p. 1].

[2]A previous action by Plaintiff raising similar claims was dismissed without prejudice by this court for failure to demonstrate exhaustion of administrative remedies. *See* CIV- 03-1289-M, Doc. Nos. 19 and 20.

to dismiss or, alternatively, for summary judgment [Doc. No. 25].  Plaintiff has objected to Defendants' motion [Doc. No. 26], has filed a reply to the supplement to the special report [Doc. No. 42] and has filed motions seeking an injunction [Doc. No. 36] and an independent physical examination [Doc. No. 43].

For the reasons set forth hereafter, the undersigned recommends that Plaintiff's official capacity claims for damages be dismissed on Eleventh Amendment grounds.  It is further recommended that judgment be granted in favor of Defendants on Plaintiff's claims – both § 1983 and negligence – with regard to the fracture and medical treatment of his left leg and the Defendants' denial of physical therapy for both legs;[3] that the remainder of Defendants' motion be denied, and that counsel be appointed for Plaintiff.[4] Finally, it is recommended that Plaintiff's motions for injunction and for an independent physical examination be denied without prejudice to be being reurged after counsel is appointed.

## Plaintiff's Contentions and Claims for Relief

Plaintiff alleges he is serving a thirty year sentence for second degree murder at Lexington Assessment & Reception Center ("LARC")[5] and is "paralyzed from the mid-

---

[3]Because these are the only claims involving Defendant Reed, this recommendation necessarily implies the dismissal of Defendant Reed from the lawsuit.

[4]Plaintiff has requested appointment of counsel through his complaint [Doc. No. 1, p. 8].

[5]Plaintiff makes reference to the Lexington Correctional Center ("LCC") in the body of his complaint but shows his address as the Lexington Assessment & Reception Center ("LARC").  For purposes of this report, the undersigned will refer to the facility where Plaintiff is housed as LARC.

chest area down due to a pre-incarceration gunshot wound." [Doc. No.1, p.2].[6]  Plaintiff

states he is confined to a wheelchair, must use a catheter to pass urine and, further, that

> Plaintiff's paralysis does not prevent him from feeling pain.  Moreover, his
> body lets him know when he is in extreme pain by sending him into cold
> sweats and convulsions.  This has occurred numerous times during the last
> three years due to his physical condition and lack of adequate pain
> medication.

*Id.*

Plaintiff contends that on May 12, 2001, following hospital treatment for

dehydration, he was placed in a DOC van with his right hand handcuffed to his

wheelchair.  *Id.*  He claims Defendant Reed, a DOC transport officer, failed to secure the

wheelchair and that Plaintiff subsequently passed out and the wheelchair rolled over,

breaking his left leg in two places.  *Id.*  Rather than returning to the hospital to secure

medical treatment for Plaintiff's leg, Defendant Reed allegedly continued back to LARC

where x-rays taken the next day confirmed the break.  *Id.*  Plaintiff maintains nothing was

done for his leg for about two weeks – during which time he was in constant pain – until

he was taken to the hospital where a cast was put on his leg "without even setting the

bone back in place."  *Id.*  After the cast was removed approximately three months later,

Plaintiff noticed the broken leg was about two inches shorter than his other leg.  *Id.*

In claims regarding catheterization and bladder care, Plaintiff contends the

medical staff at LARC  "reamed out and tore the inside of the Plaintiff's penis" by using

progressively larger catheters when they "ran out" of smaller ones.  *Id.* at p. 3.  Plaintiff

alleges he was eventually catheterized through his stomach and suffers constant pain

---

[6]Defendants' Special Report shows that the gunshot wound involved the area of Plaintiff's spine from T1 to T5 [Doc. No. 24, Attachment 3, p.1].

with frequent stomach pain and muscle spasms due to bladder infections and the placement of the catheter.  *Id.*

Plaintiff maintains he has made numerous complaints regarding  pain and the need both for adequate pain medication and for reconstructive surgery on his leg and penis.  *Id.*  The requested reconstructive surgery has been denied as "cosmetic."  *Id.* Plaintiff further complains that Defendants have refused to provide him with an "egg crate" type mattress and have likewise refused to provide regular physical therapy to prevent atrophy in his legs, thereby causing him emotional distress and depression.  *Id.*

Plaintiff's complaint consists of three counts, the first of which is against Defendant Reed whose "willful negligence" allegedly caused Plaintiff's broken leg and who allegedly demonstrated Eighth Amendment deliberate indifference by taking Plaintiff to LARC after the incident rather than returning him to the hospital.  *Id.* at p. 5. Count Two claims Defendants have been deliberately indifferent to Plaintiff's medical needs by denying reconstructive surgery for his leg and penis and by denying regular physical therapy, an egg crate mattress and adequate pain medication.  *Id.*  By Count Three, Plaintiff claims Defendants have intentionally inflicted emotional distress resulting from his embarrassment over the continued need to complain about the condition of his penis and as a result of being made to feel that he is undeserving of adequate medical care.  *Id.* at p. 6.  With respect to requested relief, Plaintiff requests

$1,000,000.00 in compensatory damages and "$9,000,000.00 in punitive damages to prevent future, similar constitutional violations by the Defendants." *Id.* at p. 10.[7]

**Standards of Review and Evidentiary Burdens**

**Dismissal for Failure to State a Claim**

Dismissal of a cause of action for failure to state a claim is proper if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543 (10th Cir. 1995). In reviewing the sufficiency of a complaint under this standard, all well-pleaded factual allegations of the complaint must be accepted as true and construed in the light most favorable to Plaintiff. *Bryson v. City of Edmond*, 905 F.2d 1386, 1390 (10th Cir. 1990). Further, a pro se plaintiff's complaint should be broadly construed. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). However, this broad reading "does not relieve the [pro se] plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

**Summary Judgment**

Summary judgment may be granted only where the pleadings and any supporting documentary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©. In considering a motion for summary judgment, the court must view the facts and

---

[7]In the jurisdictional section of his form complaint [Doc. No. 1, p. 1] and again in citing legal authorities on a separate page included with his complaint [Doc. No. 1, p. 7], Plaintiff refers to both declaratory and injunctive relief. The scope of any such requested relief, however, has not been pleaded by Plaintiff and, consequently, is not addressed here.

inferences drawn from the record in the light most favorable to the nonmoving party. *Calhoun v. Gaines*, 982 F.2d 1470, 1472 (10th Cir. 1992). A *Martinez* report is treated as an affidavit, as is the complaint, if it alleges facts based upon the plaintiff's personal knowledge and has been signed under the penalty of perjury, which is the case here. *Hall,* 935 F.2d at 1111. Material factual disputes cannot be resolved through summary judgment based on conflicting affidavits. *Id.* A dispute is "genuine" if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving] party." *Id.* at 252. Additionally, if the moving party demonstrates an absence of evidence regarding an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party can defeat summary judgment only by designating "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## Official Capacity Claims

Plaintiff has sued each of the Defendants in his or her official and individual capacities, alleging that all Defendants are employed by the Oklahoma Department of Corrections [Doc. No. 1, p. 1]. As a general rule, the Eleventh Amendment immunizes states from suit in federal court. *See Johns v. Stewart,* 57 F.3d 1544, 1552 (10th Cir. 1995)("the Eleventh Amendment bars a suit brought in federal court by the citizens of a state against the state or its agencies"). Moreover, claims for damages against a state employee in his or her official capacity are construed as claims against the State and are

6

thus likewise barred by the Eleventh Amendment.  *See Kentucky v. Graham,* 473 U.S. 159, 165-68 (1985)(a suit against an individual acting in an official capacity is properly treated as a suit against the state itself and is barred under the Eleventh Amendment); *White v. Colorado,* 82 F.3d 364, 366 (10th Cir. 1996)(Eleventh Amendment sovereign immunity barred §1983 claims against prison officials in their official capacities).

An exception to this bar exists where Eleventh Amendment immunity has been waived by the state or abrogated by Congress.  *See Ramirez v. Oklahoma Department of Mental Health,* 41 F.3d 584, 588 (10th Cir. 1994).  The State of Oklahoma has not waived its Eleventh Amendment immunity.  *Id.* at 589.  Nor has Congress abrogated the Eleventh Amendment immunity of the states through the enactment of § 1983.  *See Quern v. Jordan,* 440 U.S. 332, 345 (1979).  Therefore, the Eleventh Amendment forecloses all claims for damages against Defendants in their official capacities.

**<u>Eighth Amendment</u>**

The Eighth Amendment requires jail officials to provide humane conditions of confinement, including access to the basic necessities of medical care.  *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Estelle v. Gamble,* 429 U.S. 97, 103 (1976).  The United States Supreme Court has made clear that "deliberate indifference to serious medical needs of prisoners constitut[ing] the 'unnecessary and wanton infliction of pain,'" may amount to a violation of the Eighth Amendment.  *Id.* at 104 (citation omitted). This deliberate indifference standard has two components: (1) an objective component in which the plaintiff's pain or deprivation must be shown to be sufficiently serious, and (2) a subjective component in which it must be shown that the offending officials acted

with a sufficiently culpable state of mind. *See Handy v. Price,* 996 F.2d 1064, 1067 (10th Cir. 1993); *Miller v. Glantz,* 948 F.2d 1562, 1569 (10th Cir. 1991). As to the objective component, the Tenth Circuit has stated that a condition is sufficiently serious where the condition is one diagnosed by a physician as mandating treatment or that is so obvious even a lay person would easily recognize the necessity for a doctor's attention. *See Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980). As to the subjective prong of this test, a plaintiff must establish that a defendant knew of a substantial risk of harm and failed to take reasonable measures to abate it. *See Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999). Such deliberate indifference may be shown where prison officials "have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment." *Ramos,* 639 F.2d at 575.

Not every claim of inadequate medical treatment rises to the level of a constitutional violation. A claim of medical malpractice or negligence plainly does not constitute a constitutional violation. *Estelle,* 429 U.S. at 105. As the Supreme Court has stated:

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Id.* at 106. *See Whitley v. Albers,* 475 U.S. 312, 319 (1986) (Eighth Amendment liability requires "more than ordinary lack of due care for the prisoner's interests or safety");

*Handy*, 996 F.2d at 1067 (finding plaintiff's claim that prison doctor was negligent in treatment of Hepatitis C did not constitute a constitutional violation).   Likewise, a disagreement over a course of treatment does not amount to a constitutional violation. *Ramos*, 639 F.2d at 575 ("a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment").   Plaintiff's claims and the pertinent facts of this case will be examined against these standards.

**Leg Claims**

Plaintiff has made distinct negligence and deliberate indifference claims with regard to the fracture and subsequent care of his left leg.   He alleges that his leg was broken on May 12, 2001, due to Defendant Reed's negligence in failing to properly secure Plaintiff's wheelchair in a DOC transport van following a hospital visit [Doc. No. 1, pp. 2 and 5].   Also on May 12, 2001, Defendant Reed allegedly violated Plaintiff's Eighth Amendment rights through deliberate indifference to his serious medical needs by transporting Plaintiff to LARC rather than returning to the hospital for medical treatment after the wheelchair incident.   *Id.*

The foregoing is the substance of Count One of Plaintiff's complaint.   Elsewhere in the complaint, Plaintiff challenges the treatment provided for his injured leg by the LARC medical staff: x-rays which revealed the leg fracture were not taken until the day after the incident; nothing more was done for approximately two weeks, and Plaintiff was then taken to a hospital and his leg placed in a cast without the bone being set [Doc. No. 1, p. 2].   According to Plaintiff's pleadings, these instances of alleged

negligence/deliberate indifference would have necessarily occurred in May and June of 2001. Plaintiff subsequently requested reconstructive surgery for his leg as well as physical therapy to prevent atrophy [Doc. No. 1, p.3]

In moving for dismissal/summary judgment of Plaintiff's complaint, Defendants maintain, in part, that because Plaintiff commenced this action on January 20, 2005, "the statute of limitations[8] bars Plaintiff's claims of violations allegedly occurring prior to January 20, 2003." [Doc. No. 25, p. 10]. In objecting to Defendants' motion, Plaintiff does not dispute the applicability of the two year limitations period but argues, instead, that he complained about these same issues in his first action filed in September, 2003,[9] thereby complying with the statute of limitations by prosecuting his complaints within two years from the occurrence of the alleged violations [Doc. No. 26, pp. 8 - 9].

Arguably, Plaintiff is relying on the Oklahoma savings statute:

> If any action is commenced within due time, and a judgment thereon for the plaintiff is reversed, or if the plaintiff fail in such action otherwise than upon the merits, the plaintiff . . . may commence a new action within one (1) year after the reversal or failure although the time limit for commencing the action shall have expired before the new action is filed.

Okl. St. tit. 12 § 100 (2000).

Assuming *arguendo* that Plaintiff's first action contained sufficient allegations to suggest a claim for relief with respect to his leg, as to those events relating to Plaintiff's

---

[8]Defendants correctly assert that the applicable limitations period for civil rights claims (and other personal injury actions) is two years. The limitations period for a civil rights action is governed by the forum state's law pertaining to personal injury actions. *Wilson v. Garcia,* 471 U.S. 261, 276 - 80 (1985). In Oklahoma, that limitations period is two years. *See Meade v. Grubbs,* 841 F.2d 1512, 1522 (10th Cir. 1988).

[9]*See supra* note 2. Plaintiff's form complaint in that case does not make reference to his leg but a document entitled "Statement of Christopher Keith" and incorporated with the complaint includes the same negligence allegations as are made in the current action.

leg fracture on May 12, 2001, and the treatment that followed in May and June of 2001, the two-year statute of limitations applicable to both personal injury and Section 1983 actions in Oklahoma had already expired when Plaintiff commenced that first action on September 9, 2003.  Accordingly, even though Plaintiff successfully commenced the current action within one year after his first case was dismissed for failure to demonstrate exhaustion of  administrative remedies – first action ordered dismissed on July 28, 2004,[10] and new action filed on January 20, 2005 – the savings statute would not be triggered as to any claims arising before September 9, 2001, two years prior to the September 9, 2003, filing date of the first action, because an action on those claims had not been "commenced within due time."  Okl. St. tit. 12 § 100 (2000).

Consequently, Plaintiff's claims against Defendant Reed for his alleged willful negligence in causing Plaintiff's leg fracture and for his alleged deliberate indifference in returning Plaintiff to LARC rather than the hospital after the incident are time-barred, and it is recommended that Defendant Reed's motion for summary judgment be granted pursuant to Rule 56 (c), Fed.R.Civ.P.  Because these are Plaintiff's only claims against Defendant Reed, it is further recommended that Defendant Reed be dismissed from the action.

Any claims that Plaintiff may be attempting to assert against the remaining Defendants with respect to their care of his fractured leg prior to September 9, 2001, are also time-barred.  Contrary to Defendants' argument, however, the fact that Plaintiff is barred from seeking damages for the fracture and care of his leg prior to September 9,

---

[10]*See* CIV-03-1289-M, Doc. No. 20.

2001, does not automatically suggest a bar of Plaintiff's claim that Defendants were deliberately indifferent in denying his requests for reconstructive surgery and physical therapy to prevent atrophy in his legs. The fact that Plaintiff was aware that his leg was broken and not properly set in a cast in May and June of 2001, does mean that he then knew or should have known that he would subsequently be denied surgery to repair the damage. "A civil rights action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Baker v. Board of Regents,* 991 F.2d 628, 632 (10th Cir. 1993). Defendants' own summary judgment evidence, in fact, demonstrates that it was not until December 7, 2001, that an orthopedic specialist examined Plaintiff and determined that operative intervention in connection with the delayed union of the bones in Plaintiff's left leg would not be "necessary at this point." [Doc. No. 25, p. 3; Doc. No. 24, Attachment 12]. Presumably, Defendants had not made a final decision to deny reconstructive surgery until receiving the specialist's report.[11]

Nonetheless, and apart from the issue of limitations, the question remains as to whether Defendants' actions in refusing Plaintiff's requests for reconstructive surgery on his leg and physical therapy to prevent atrophy constitute deliberate indifference. The undisputed evidence reveals that on October 15, 2001, per the medical staff at LARC, an orthopedic consultative examination was requested to follow up on an October 12, 2001, examination and x-ray study of Plaintiff's leg [Doc. No. 34, pp. 567, 569 and 575]. Additional x-rays were subsequently taken and read, *id.* at pp. 694 and 699, and, on

---

[11]Defendants have not proffered evidence establishing when Plaintiff knew or should have known that his request for reconstructive leg surgery was denied.

12

December 7, 2001, Plaintiff was examined by the orthopedic specialist who gave an opinion on the necessity of operative intervention [Doc. No. 24, Attachment 12].

The orthopedic specialist examined Plaintiff's leg and found it to be without sensation, gross deformity, gross motion or skin breakdown. *Id.* The specialist examined the x-rays of Plaintiff's leg and diagnosed a *delayed* union of a left tibia fracture. *Id.* The specialist then prescribed the following plan: "[O]perative intervention not necessary at this point. Will show delayed healing because non w[eight] bearing. If develops nonunion would be elective surgery." *Id.*

As to the dual components of the deliberate indifference standard under the Eighth Amendment, the objective component has been met in connection with Plaintiff's leg. *See Ramos,* 639 F.2d at 575. The condition of Plaintiff's fractured leg – a delayed bone union – was sufficiently "serious" as to trigger the need for a determination regarding treatment, including reconstructive surgery. As to the subjective prong of this test, however, Plaintiff cannot establish that Defendants knew of a substantial risk of harm and failed to take reasonable measures to abate it. *See Hunt*, 199 F.3d at 1224. The undisputed evidence demonstrates that Defendants specifically sought and obtained the evaluation of an orthopedic specialist to determine whether Plaintiff needed further treatment or reconstructive surgery on his leg. The specialist opined that even if a non-union developed, surgery on a wheelchair-bound Plaintiff's leg would be elective. Plaintiff, who admits he is confined to a wheelchair [Doc. No. 1, p. 2], disagrees with that determination and with the decision not to provide physical therapy to prevent muscle wasting in his legs. A disagreement over a course of treatment, however, does not amount

13

to a constitutional violation. *Ramos*, 639 F.2d at 575 ("a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment").  It is recommended that Defendants' motions for summary judgment with respect to all of Plaintiff's claims, whether of negligence or deliberate indifference under the Eighth Amendment, be granted pursuant to Rule 56 (c), Fed.R.Civ.P.

**Egg Crate Mattress Claim**

It is further claimed that Defendants have demonstrated deliberate indifference to Plaintiff's serious medical needs by confiscating and refusing to replace an egg crate mattress that was prescribed for him by DOC medical staff [Doc. No. 1, p. 5].  The record reveals that, effective November 15, 2001, a physician at James Crabtree Correctional Center – where Plaintiff had been temporarily transferred from LARC – determined from medical examination/medical records that Plaintiff would benefit from an egg crate mattress [Doc. No. 34, p. 589].  The mattress was issued to Plaintiff on the following day. *Id.* at p. 674.  Included in Defendants' Special Report is the affidavit of David Fleck, a LARC safety consultant, who confirms that the mattress was confiscated from Plaintiff after his return to LARC from James Crabtree Correctional Center [Doc. No. 24, Attachment 22, p. 2].  Mr. Fleck states that the mattress – a Span America Medical Systems Convoluted Pat #SP37S-000 – was not allowed at LARC as it had not been approved by the Oklahoma State Fire Marshal's Office.  *Id.*  The only mattress receiving approval from the State Fire Marshal's office was the GEO Matt-cat#SP653-000.  *Id.*

A June 18, 2002, interoffice memorandum  from Mr. Fleck sent to the Chief Code Enforcement Division "[t]hru" Defendant Reginald Hines, *id.* at p. 1, confirmed that "[t]he facility's medical division has recommended that a paraplegic inmate on our medium security yard needed a foam type mattress for the prevention of bedsores."  *Id.*  The memo continues by stating that "the inmates family has sent in a Span America Medical Systems GEO Matt-cat#SP653-000" and provides that, on approval, "the mattress will be issued to the inmate."  *Id.*  Not only does this model of foam mattress appear to be the same model that Mr. Fleck's affidavit state had been approved by the Oklahoma State Fire Marshal's Office, *id.* at p. 2, but the memo itself bears the stamp "Approved State Fire Marshal" and the date "6-21-02."  *Id.* at p. 1.  Nonetheless, the record indicates that Plaintiff did not receive his egg crate mattress until April 15, 2005, some three years later [Doc. No. 34, p. 734].

In moving for summary judgment on Plaintiff's claim that Defendants demonstrated deliberate indifference in not providing him with the egg crate mattress, Defendants argue the "[by the time approval was received for a fire-proof egg crate, Plaintiff had been issued two regular mattresses in place of the egg crate, and Plaintiff did not file any *medical* grievances requesting an egg crate in place of the two mattresses." [Doc. No. 25, p. 8].

Disputed questions of fact preclude summary judgment on Plaintiff's claim in connection with the egg crate mattress that had been ordered by the medical division, furnished by Plaintiff's family, approved by the State Fire Marshal but not delivered to Plaintiff for approximately three years.  Simple negligence or inadvertent failure to

provide a medically necessary mattress is not a constitutional violation. "Deliberate indifference" must be demonstrated by proof that corrections personnel intentionally denied, delayed access to, or interfered with the prescribed treatment. *Estelle,* 429 U.S. at 104 - 105. Whether a named Defendant[12] intentionally interfered with prescribed medical treatment is in dispute, and summary judgment on this claim is precluded. Moreover, Plaintiff's right to receive treatment prescribed by his physicians was a clearly established right at the time Plaintiff's claim arose,[13] and, based upon Plaintiff's prima facie showing of a violation of his constitutional rights, Defendants are not entitled to judgment as a matter of law based on qualified immunity.

## Catheterization, Bladder and Pain Medication Claims

Plaintiff maintains that the medical staff at LARC reamed the inside of his penis in the course of changing his indwelling catheter and that a suprapubic catheter was ultimately placed in his bladder through his abdomen [Doc. No. 1, p.3]. He contends that he suffers constant pain and bladder spasms due to bladder infections and the placement of the catheter and that he has made numerous requests for adequate pain medication and reconstructive surgery on his penis. *Id.* Plaintiff maintains that his "paralysis does not prevent him from feeling pain" and that "his body lets him know when he is in

---

[12]Whether Plaintiff has named the individual or individuals responsible for delaying his access to the egg crate mattress was not an issue raised by Defendants' motion.

[13]Defendants also urge that Plaintiff's claim in connection with the egg crate mattress arose on November 11, 2001, and is barred by the statute of limitations [Doc. No. 25, p. 10]. By way of proof, Defendants point to Attachment 13 of their Special Report. [Doc. No. 24, Attachment 13]. Attachment 13, however, contains no reference to an egg crate mattress. In his affidavit Safety Consultant Fleck asserts that an egg crate style mattress was issued to Plaintiff at JCCC on November 11, 2001. However, such mattress was apparently later confiscated. It is not apparent from the record when Plaintiff became aware that he had been denied the use of an egg crate mattress furnished by his family and approved by the State Fire Marshal for his use.

extreme pain by sending him into cold sweats and convulsions." *Id.* at p. 2. It is Plaintiff's contention that "[t]his has occurred numerous times during the last three years due to his physical condition and the lack of adequate pain medication." *Id.*

In moving for summary judgment on Plaintiff's claims in this regard, Defendants' statement of facts,[14] citing supporting evidence from the Special Report, maintains that "Plaintiff is required to use a catheter to pass urine and had one in place upon arrival to LARC." [Doc. No. 25, p. 3]. Defendants further maintain as a statement of fact that according to June, 2001, medical records, Plaintiff advised a Physician's Assistant that he had caught his catheter on something, wounding/tearing open his penis; that "[m]edical records indicate and Plaintiff states that the penis had been previously torn and healed," and that Plaintiff subsequently claimed that his penis was damaged because a catheter which was too large for his penis was inserted and that the catheter, when later removed, tore the inside of his penis. *Id.* Defendants' final statement of fact in connection with this deliberate indifference claim is that "[a] standard catheter for an adult male is 18 - 20, which was the size used on Plaintiff." *Id.* at p. 3. In the argument portion of their brief, Defendants reurge these facts,[15] contending that Plaintiff alleges that Defendants tore the inside of his penis through ill-fitting catheters but that Plaintiff's

---

[14]Presumably, this statement of facts is responsive to the requirement that a "brief in support of a motion for summary judgment . . . shall begin with a section that contains a concise statement of material facts to which the moving party contends no genuine issue of fact exists." *See* Local Civil Rules of the United States District Court for the Western District of Oklahoma, LCvR56.1(b).

[15]Here, however, Defendants argue that "Plaintiff was *always* given a #18 catheter and nothing larger, which is standard for adult males 18-20 years old." [Doc. No. 25, p. 7].

medical records do not support his claim that Defendants are responsible for these injuries [Doc. No. 25, p. 6].

There is no question that Plaintiff has, in describing the background of his case, contended that the LARC medical staff caused the deterioration[16] of his penis through improper catheterization [Doc. No. 1, p. 2].   Likewise, there is no question that Defendants have provided a statement of material facts suggesting that Plaintiff caused at least one tear in his penis and further maintaining that the LARC medical staff always used an appropriately sized catheter.   Plaintiff's *claim for relief*, however, is not focused on what, or who, caused his current condition but on how it is being treated.   His claim is that Defendants are deliberately indifferent to his serious medical needs through their denial of adequate pain medication and in their refusal to provide reconstructive surgery on his penis.   He claims that, despite his paraplegia, he experiences pain that is manifested by bodily reactions.   He claims that this has been happening for three years and claims that it involves muscle spasms due to bladder infections and the placement of his catheter.

Defendants' statement of undisputed material facts does not address their treatment of Plaintiff's medical needs; instead, Defendants simply claim that they are not

---

[16]The June 3, 2002, operative note regarding the insertion of Plaintiff's suprapubic tube states that
> The patient is a 28-year-old paraplegic who has a chronic indwelling urethral Foley.   He has been in DOC custody and has had breakdown and erosion of his urethra to the point that he has a near penoscrotal hypospadias.

[Doc. No. 34, p. 729].

A "hypospadias" is an anomaly in which the urethra opens on the underside of the penis, and a "penoscrotal hypospadias" is one in which the urethral orifice is at the junction of the penis and the scrotum. *See Dorland's Illustrated Medical Dictionary,* p. 808 (27th Ed. 1988).

responsible for causing Plaintiff's injuries.[17]  It is only in the argument portion of their brief that Defendants make *any* reference to Plaintiff's bladder care.  There, Defendants repeat Plaintiff's allegation that he suffers from bladder infections and muscle spasms and point to evidence that Plaintiff had urinary tract infections upon arrival to LARC – in May, 2001 – and was immediately treated with prescription drugs [Doc. No. 25, p.7]. Defendants further argue that Plaintiff's medical records indicate that he has been treated for muscle spasms and refer to a two-page attachment to their Special Report.  *Id.*  This attachment consists of a medication chart from April, 2002, and one page of progress notes from July 20, 2004 [Doc. No. 24, Attachment 18].  Other than next establishing that Plaintiff was a no-show for various medical appointments and failed on two occasions to pick up prescribed medications [Doc. No. 24, Attachments 19 and 20], Defendants submit no additional evidence to demonstrate the extent and adequacy of Plaintiff's medical care in connection with his suprapubic catheterization and bladder spasms.[18]

With one exception, the "Administrative Investigation" portion of Defendants' Special Report makes allegations that are similar to the foregoing referenced section of their summary judgment brief [Doc. No. 24, Administrative Investigation, p. 4].  In the Administrative Investigation, after reciting that "[i]nmate Keith states he is in constant pain and suffers bladder infections," the following is then immediately added: "The

---

[17]Similarly, Defendants' statute of limitations argument focuses on the timing of the cause of Plaintiff's injuries rather than on than on the timing of Defendants' treatment of such injuries.

[18]In order that Plaintiff would have access to all pertinent documentation in preparing his response to Defendants' dispositive motion, the undersigned ordered supplementation of the Special Report with a *complete* set of Plaintiff's medical records [Doc. No. 28].  After the supplemental filing was made a part of the record, Defendants did not seek to amend their summary judgment motion to include any additional evidence in support of their motion.

definition of paralysis is 'loss of sensation' (Attachment 17)." *Id.* Attachment 17 consists of a definition of paralysis copied from a book entitled *Taber's Cyclopedic Medical Dictionary*. It shows a definition of paralysis to be "temporary suspension or permanent loss of function, esp. loss of sensation or voluntary motion."

Defendants have not advanced as a statement of undisputed fact, supported by evidence in the record, that *Plaintiff*, as a paraplegic, has lost the sensation to pain. Whether *Plaintiff* is suffering from pain or from his body's reaction to pain, as he claims in his sworn complaint, is a question that the Defendants have not addressed and, consequently, remains at issue. As to whether it is *possible* for a paraplegic to experience the type of pain described by Plaintiff, the answer is clearly affirmative. Information in links provided by the U.S. National Library of Medicine and the National Institutes of Health on the World Wide Web[19] suggests that chronic pain is common in individuals who have had a spinal cord injury ("SCI)[20]; emphasizes the importance of bladder care and management for SCI patients,[21] and discusses the danger of Autonomic

---

[19]http://www.nlm.nih.gov/medlineplus/spinalcordinjuries.html

[20]"Acute pain is common after a spinal cord injury (SCI). The pain may occur as a result of the damage to the spinal cord, or it may occur from damage to other areas of the body at the time of injury.

It is also common for many individuals with SCI to experience chronic pain. It can occur in areas where there is normal sensation, and it can occur in parts of the body where there is little or no feeling after injury. The pain is very real and may have a great impact on daily living."

http://www.spinalcord.uab.edu/show.asp?durki=41119 (Emphasis added).

[21]"Individuals with SCI are at a high risk for urinary tract infection (UTI). In fact, *complications due to UTI are the #1 medical concern* and more likely to affect your overall health and health care costs.

The source of UTI is bacteria. Bacteria are a group or colony of tiny, microscopic single-celled life forms that live in the body and are capable of causing disease or infection.

(continued...)

Dysreflexia.[22]  It is, of course,  entirely possible that Plaintiff's medical records contain conclusive evidence of Plaintiff's  inability to experience the pain and sensations of which he complains, and it is equally possible that the records, if presented in support of undisputed facts that address the treatment rather than the cause of Plaintiff's injuries, would demonstrate that Defendants have not been deliberately indifferent to Plaintiff's medical needs.  Defendants' motion for summary judgment, however, does not effectively reach either issue.

For the reason that disputed issues of fact remain with regard to Plaintiff's claim that Defendants have been deliberatively indifferent to Plaintiff's medical needs in connection with his catheterization/bladder care (including the necessity of reconstruction of his penis) as well as with related pain management, it is recommended that Defendants' motion for summary judgment be denied as to this claim.  Because an

---

[21](...continued)

It is normal for individuals with SCI to have bacteria in their bladder. Bacteria from the skin and urethra are easily brought into the bladder with ICP, Foley, and Suprapubic methods of bladder management. Also, individuals with SCI are often not able to completely empty their bladder. Bacteria are likely to grow in urine that stays in the bladder.

* * *

Bacteria reproduce and they can quickly multiply. When some bacteria multiply, they lead to infection.

Some of the symptoms of illness are fever, chills, nausea, headache, increased spasms, and autonomic dysreflexia (AD). Depending on your level of injury, you may also feel burning while urinating, and/or discomfort in the lower pelvic area, abdomen, or lower back. You may experience one symptom or more than one if you have a UTI."

http://www.spinalcord.uab.edu/show.asp?durki=21484

[22]"Autonomic Dysreflexia, sometimes called hyperreflexia or AD, can occur in persons with a spinal cord injury at or above the T6 level . AD happens when there is an irritation, pain, or stimulus to the nervous system below the level of injury. The irritated area sends a signal to the brain but it is not able to reach the brain. A reflex action takes place, tightening blood vessels, causing the blood pressure to rise. If the high blood pressure is not controlled it may cause a stroke, seizure, or death."

http://www.spinalcord.uab.edu/show.asp?durki=21426

independent medical examination could be required in order to fully address these issues, appointment of counsel is recommended at this stage of the proceeding to advise Plaintiff on this process and other related matters.

## RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT

For the reasons stated above, it is recommended that all claims against Defendants in their official capacities be dismissed; that Defendants' motion for summary judgment [Doc. No. 25] with respect to Plaintiff's claims of negligence and deliberate indifference regarding the fracture and treatment of, and refusal to provide reconstructive surgery/physical therapy on, Plaintiff's leg(s) be granted; that Defendant Reed be dismissed from the action; that Defendants' motion for summary judgment be, in all other respects, denied; that counsel be appointed for Plaintiff, and that Plaintiff's motions for injunction [Doc. No. 36] and for an independent physical examination [Doc. No. 43] be denied without prejudice to be being reurged after counsel is appointed.

The parties are advised of the right to file an objection to this Report and Recommendation with the Clerk of this Court by the 1st day of March, 2006, in accordance with 28 U.S.C. §636 and Local Civil Rule 72.1. Failure to make timely objection to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).


This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter.

ENTERED THIS 9th day of February, 2006.

BANA ROBERTS
UNITED STATES MAGISTRATE JUDGE